# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

CRISTINA VALLECILLO,

      Claimant,

vs.

ANDREW M. SAUL,

Commissioner of Social Security,[1]

      Defendant.

No. 18-CV-2034-CJW

**REPORT AND RECOMMENDATION**

_____

     Plaintiff, Cristina Vallecillo ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act.  Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled.  For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I.	BACKGROUND

     I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and only summarize the pertinent facts here.  Claimant was born on December 14, 1955.  (AR[2] at 295.)  Claimant is a high school graduate and attended two years of college.  (*Id.*

---

[1]After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

at 327.)  Claimant allegedly became disabled due to visual impairments, diabetes, arthritis in her hands, and asthma.  (*Id.* at 207.)  Claimant's alleged onset of disability date was November 9, 2012.  (*Id.* 295.) Claimant filed an application for Social Security disability benefits on January 8, 2015.  (*Id.*)  She filed an application for supplemental security income on January 5, 2015.  (*Id.* at 242.)   Claimant was initially denied benefits on February 5, 2015 and February 23, 2015.  (*Id.* at 206-15, 242.)  Reconsideration was denied on July 22, 2015.  (*Id.* at 134.)  Claimant filed a Request for Hearing on August 13, 2015.  (*Id.* at 240-41.)  A telephonic hearing was held on May 23, 2017 with ALJ Gerald Meyr and a vocational expert ("VE") in Kansas City, Missouri and Claimant, her counsel, and a hearing reporter in Waterloo, Iowa.  (*Id.* at 173-205, 259.)  Claimant and the VE both testified.  (*Id.* at 178-204.)

The ALJ entered an unfavorable decision on December 7, 2017.  (*Id.* at 131-50.) On January 18, 2018, Claimant filed a Request for the Appeals Council to review the ALJ's decision.  (*Id.* at 292-94.)  The Appeals Council found there was no basis to review the ALJ's decision on April 24, 2018.  (*Id.* at 1-3.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On June 13, 2018, Claimant timely filed her complaint in this Court.  (Doc. 4.) All briefs were filed by January 23, 2019.  On January 23, 2019, the Honorable Charles J. Williams, United States District Court Judge, referred the case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996)); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not

severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it.

20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     *The ALJ'S Findings*

The ALJ made the following findings at each step regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since November 9, 2012, the alleged onset date. (AR at 136.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: obesity, retinopathy, uveitis, glaucoma, cataracts, retinal edema, and osteoarthritis of both hands.[3] (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations. (*Id.* at 137.) Specifically, the ALJ considered the claimant's retinopathy under listing 2.02 for loss of central visual acuity and claimant's joint impairment (osteoarthritis) under listing 1.02 for major dysfunction of a joint. (*Id.* at 138.)

At step four, the ALJ found that Claimant had the RFC to perform medium work with the following limitations:

The claimant can never climb ladders, ropes, or scaffolds. The claimant's

---

[3] Claimant's various impairments will be elaborated upon as relevant to the discussion.

handling of objects, which is gross manipulation, is limited to frequently with the bilateral upper extremities. The claimant's fingering, which is fine manipulation of objects no smaller than the size of a paper clip, is limited to bilaterally and frequently with the upper extremities. The claimant's feeling is limited to bilaterally and frequently with the upper extremities. The claimant should avoid any exposure to unshielded moving mechanical parts, should have no operation of commercial vehicles and should have no exposure to unprotected heights. The claimant should have no exposure to chemicals. The claimant is limited to occupations that would require occasional near and far acuity including depth perception.

(*Id.*) The ALJ noted that he was limiting Claimant's RFC to the medium level base, in part, because of "testimony about lifting putting pressure on [Claimant's] eyes." (*Id.* at 142.) The ALJ also found that Claimant was not capable of performing any of her past relevant work. (*Id.* at 143.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform, including counter supply worker, linen room attendant, and change house attendant. (*Id.* at 144.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

**B.      *The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## C. Duty to Develop the Record

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988)) (bracketed information added).

## III. DISCUSSION

Claimant (1) alleges the ALJ committed reversible error by failing to give good reasons for assigning no weight to the bending and lifting restrictions in the opinion of Claimant's treating ophthalmologist and (2) challenges the validity of the ALJ's decision because she contends the ALJ was not properly appointed under *Lucia v. SEC*, 138 S. Ct. 2044 (2018). (Doc. 13 at 1.)

***A.  The ALJ properly explained his reasons for assigning no weight to the bending
and lifting restrictions in Dr. Folk's opinion.***

Claimant's argument is a narrow one. Dr. Folk's lifting and bending restrictions comprise only part of his opinion. Claimant does not take issue with how the ALJ weighed the rest of Dr. Folk's opinion or with any other part of the ALJ's RFC. The following physicians provided medical opinions in this case.

***1.  Dr. James Folk***

Dr. James Folk is Claimant's treating ophthalmologist. (Doc. 13 at 4.) Dr. Folk began treating Claimant on November 9, 2012 and wrote his opinion on April 19, 2017. In relevant part, Dr. Folk stated that Claimant was diagnosed with diabetic macular edema in both eyes, that her prognosis was guarded, that her symptom was blurred vision, and that the best visual acuity correction she achieved was 20/60 in her right eye and 20/100 in her left eye.[4] (AR at 834.) Dr. Folk opined that Claimant can occasionally perform work activities involving "near [visual] acuity," "far [visual] acuity," and depth perception. (*Id.* at 835.) Dr. Folk further opined that Claimant can never perform work activities involving "[visual] accommodation."[5] (*Id.*) Dr. Folk further opined that Claimant was capable of avoiding ordinary work hazards, "such as boxes on the floor, doors ajar, [and] approaching people or vehicles," and that she could work with large objects. (*Id.*) In addition, Dr. Folk opined that Claimant could lift and carry 20 pounds in a competitive work situation, but did not fill out the portion of the form that asked him to check how often she could do this (i.e., never, rarely, occasionally, or frequently). (*Id.*) Dr. Folk stated that Claimant could occasionally stoop, bend, and crouch/squat.

---

[4] "Acuity" is "clarity or clearness, especially of the vision." *Dorland's Illustrated Medical Dictionary* 24 (32d ed. 2012). "Visual acuity" is "the ability to discriminate visually between forms . . . ." *Id.*

[5] "Accommodation" is "adjustment, especially that of the position and shape of the lens of the eye for focusing at various distances." *Id.* at 10.

(*Id.*)  When asked to explain the medical basis for the restrictions he assigned and whether they were related to Claimant's eye problems, Dr. Folk said only, "Can't see well." (*Id.*)

The  ALJ gave the portion of Dr. Folk's opinion related to Claimant's visual problems and functionality great weight because the opinion was consistent with Claimant's self-reports of activities involving near acuity, far acuity, and depth perception such as yard work, personal hygiene, housework, meal preparation, "and other activities in her life despite her visual difficulties." (*Id.* at 141.)  The ALJ found that Dr. Folk's opinion discredited some of Claimant's alleged severe functional restrictions, specifically Claimant's testimony at the hearing on this matter that she is unable to navigate a room or to avoid ordinary hazards such as things on the floor or approaching people.  (*Id.* at 141-42, 189-90.)

The ALJ gave the portion of Dr. Folk's opinion related to Claimant's  "other areas of functionality such as lifting capacity, stooping and crouching" no weight because these areas were "beyond Dr. Folk's expertise." (*Id.* at 142.)

### 2.    *Dr. John J. Alpar*

On July 14, 2017, Dr. John Alpar, M.D., an ophthalmologist who reviewed the case at the request of ALJ Meyr, provided his medical expert opinions as to Claimant's restrictions.  (*Id.* at 863, 880-81.)  Dr. Alpar reviewed medical records and never examined Claimant.  (*Id.* at 877.)  His opinion is written on a form provided by the Social Security Administration ("the SSA").  Dr. Alpar "marked the limitations which are based exclusively on [Claimant's] eye condition" and found two things of note regarding Claimant's vision impairments: "I would like to call attention to VI of the work related activities number 2 c large prints and large fonts. And on VII she can probably operate a motor vehicle because her vision is sufficiently good, but she very likely will get a restricted license." (*Id.* at 880.)  Dr. Alpar also opined that Claimant could lift

and carry up to ten pounds occasionally. (*Id.* at 881.) The ALJ gave Dr. Alpar's opinion regarding Claimant's visual restrictions partial weight because it was generally consistent with Dr. Folk's opinion. (*Id.* at 142.) However, the ALJ gave his opinion regarding Claimant's lifting and carrying restrictions no weight because those opinions were beyond Dr. Alpar's expertise and because Dr. Alpar specifically stated that he only "marked limitations based on the claimant's eye condition and [did] not consider other factors such as obesity." (*Id.*)

### 3. *Dr. John Anigbogu*

On July 27, 2017, Dr. John Anigbogu, a physical medicine and rehabilitation specialist who reviewed the case at the request of ALJ Meyr, provided an expert opinion as to Claimant's restrictions. (*Id.* at 850, 862, 882-91.) Dr. Anigbogu reviewed the record and never examined Claimant. (*Id.* at 882.) His opinion is written on a form provided by the SSA. Dr. Anigbogu diagnosed Claimant with diabetes mellitus with retinopathy; history of retinal detachment; cataract; glaucoma; a history of a left wrist ganglion cyst; low back pain; and obesity. (*Id.* at 882.) In relevant part, Dr. Anigbogu opined Claimant could lift and carry up to ten pounds occasionally. (*Id.* at 886.) In addition, Dr. Anigbogu found no reaching, handling, fingering, feeling or pushing and pulling restrictions. (*Id.* at 888.) Dr. Anigbogu noted various environmental and postural restrictions, but did not opine as to Claimant's bending restrictions because the form did not have a space for that. The reaching in all directions restrictions are the best substitute for bending restrictions. (*Id.* at 889-90.) Dr. Anigbogu also opined as to Claimant's vision restrictions, stating that she could avoid ordinary hazards, read ordinary print, view a computer screen, and determine differences in shape and color of small objects, but that she could not read very small print. (*Id.* at 890.) The ALJ gave little weight to Dr. Anigbogu's opinion. (*Id.* at 142.) First, the ALJ found that Dr. Anigbogu's opinions related to Claimant's vision restrictions were outside his area of expertise. (*Id.*)

Second, the ALJ found that Dr. Anigbogu's opinions related to Claimant's physical restrictions were not supported because Dr. Anigbogu did not specify which impairments cause his recommended restrictions. (*Id.*) In addition, the ALJ found that Dr. Anigbogu's opinion was inconsistent with Claimant's testimony that she is left-handed; Dr. Anigbogu stated she was right-handed. (*Id.*)

### 4. *State Agency Medical Consultants Dennis Weis, M.D. and Jan Hunter, D.O.*

In relevant part, Dennis Weis, M.D., who reviewed the record for the state agency on February 23, 2015, concluded that Claimant had the following visual impairments: limited left eye near and far acuity and "some difficulty with fine detail with left eye near and far." (*Id.* at 211.) He supported these restrictions by stating that Claimant

> indicated she was driving a car until few months previously. Due to vision issues. She continues to shop and run errands. She states she can read extra large print. . . . Her visual condition remains stable with visual acuities between approximately 20/50 in the right eye and 20/70 in the left eye. . . . Treating sources do not make specific recommendations regarding residual function capacity.

(*Id.* at 212.) Regarding bending and lifting restrictions, Dr. Weis opined that Claimant had no exertional restrictions. (*Id.* at 211.) On appeal, Jan Hunter, D.O., affirmed Dr. Weis's opinion. (*Id.* at 222.) The ALJ gave these opinions partial weight because neither physician accounted for the effects of Claimant's obesity on her conditions. (*Id.* at 142.) The ALJ noted that Claimant has consistently been diagnosed with morbid obesity, and the ALJ stated, "While there is very little if any direct evidence of functionality limitations on the claimant due to morbid obesity, the undersigned has limited exertional to medium to account for the claimant's arthritis and testimony about lifting putting pressure on her eyes." (*Id.*)

### 5.    Analysis

An ALJ's RFC must ordinarily be supported by a treating or examining source opinion to be supported by substantial evidence. *See Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[6] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted).

Claimant argues that the ALJ erred when he gave Dr. Folk's opinion regarding Claimant's "lifting, stooping, and crouching" restrictions no weight because "[g]enerally, an M.D., even one that chose to specialize as an ophthalmologist, is able

---

[6] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations became effective on March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claims were filed on January 5 and 8, 2015. Thus, the old regulations apply. *See id.*

to opine as to general physical restrictions—an ALJ may not assign no weight to non-vision related restrictions simply because the ophthalmologist specializes in eye-related treatment." (Doc. 13 at 5.) Claimant asserts that the Commissioner successfully made this very argument when "defending her non-examining ophthalmologist medical consultant opinions in a cardiac case in federal court" in *Payne v. Berryhill*, No. 6:17-cv-67-Orl-DNF, 2018 WL 4520353 (M.D. Fla. Sept. 21, 2018).[7]

Claimant argues that the ALJ erred by not giving at least "little weight" to Dr. Folk's opinions regarding Claimant's physical restrictions. (Id.) Claimant relies on 20 C.F.R. § 404.1527(c)(2)(ii), which provides the following:

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her medical opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's medical opinion more weight than we would give it if it were from a nontreating source.

Based on this provision, Claimant asserts that Dr. Folk's opinion regarding her physical restrictions was entitled to more weight because Dr. Folk was Claimant's

---

[7] I find *Payne* distinguishable from the case at bar because the ophthalmologist's opinion at issue in that case was a state agency reviewing physician opinion to which the ALJ chose to assign more weight than he chose to assign to the opinion of the claimant's treating physician. 2018 WL 450353, at *5. The ALJ reasoned that although the state agency physician was an ophthalmologist, "[s]tate agency consultants are highly qualified specialists who are experts in Social Security disability programs, and their opinions may be entitled to great weight if the evidence supports their opinions." *Id.* (citing 20 C.F.R. § 404.927(e)(2)(i)). The ophthalmologists in the case at bar are not "experts in Social Security disability programs." Therefore, this comparison is not apt.

treating source who had "reasonable knowledge of [her] 'Diabetic Macular Edema both eyes' and that impairment limited her to light exertional level work with bending or stooping limitations." (Doc. 13 at 5) (citing Dr. Folk's opinion).

When a treating physician's medical opinion is not given controlling weight, the following factors will be applied to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

I find that the ALJ did not err in failing to give Dr. Folk's opinion controlling weight because it is "inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c). The proper weight to give this non-controlling physician opinion is determined through an analysis of the six factors listed above. No one takes issue with how the ALJ weighed Dr. Folk's opinion related to Claimant's visual restrictions. Therefore, this analysis will focus only on Dr. Folk's opinion of Claimant's exertional restrictions. In addition, because there is a question about Dr. Folk's qualifications as both a medical doctor and an ophthalmologist, I will address the factors out of order because that will assist me in resolving the issue before the Court.

### a. Length and Frequency of the Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). One reason the ALJ assigned no weight to Dr. Folk's opinion regarding exertional restrictions was that Dr. Folk did not have a longitudinal treating history with Claimant for anything other than eye problems. (AR at 141.) Although Dr. Folk often noted in his treatment notes that he "[e]ncouraged blood glucose, blood pressure, and cholesterol control" (*e.g.*, AR at 641), those notes seem

related to eye problems, and even if they were not related to eye problems, they are not related to the exertional restrictions at issue.

Accordingly, I find this factor weighs in favor of affording Dr. Folk's exertional restrictions no weight.

### b. Nature and Extent of the Treatment Relationship

"The more knowledge a treating source has about [a claimant's] impairment(s) the more weight the [ALJ] will give the source's opinion." 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered." *Id.* Claimant saw Dr. Folk for over four years for treatment of her eye problems. Claimant never saw Dr. Folk for other problems. Claimant does not cite treatment notes wherein Dr. Folk assigned Claimant exertional restrictions, tested Claimant for exertional restrictions, discussed exertional restrictions, or ordered examinations or tests related to exertional restrictions, and I did not find any during my review of Dr. Folk's treatment notes. Therefore, I find this factor weighs in favor of affording Dr. Folk's exertional restrictions no weight.

### e. Specialization

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Folk is an ophthalmologist. According to the American Academy of Ophthalmologists,

> An ophthalmologist is a medical or osteopathic doctor who specializes in eye and vision care. Ophthalmologists complete 12 to 13 years of training and education, and are licensed to practice medicine and surgery. . . . Typical training includes a four-year college degree followed by at least eight years of additional medical training.

.    .    .

> Because they are medical doctors, ophthalmologists can sometimes recognize other health problems that aren't directly related to the eye, and refer those patients to the right medical doctors for treatment.

Am. Acad. Ophthalmology, *Ophthalmologist*, https://www.aao.org/eye-health/tips-prevention/what-is-ophthalmologist.

The ALJ found that Dr. Folk's opinion related to exertional restrictions was beyond his expertise. (AR at 142.) However, as Claimant argues, and as the above demonstrates, ophthalmologists have a broader base of medical knowledge than just the eye. Therefore, while Dr. Folk did not specialize in general medicine or family medicine or some other area that would have seemed more relevant to the ALJ, he is a medical doctor as well as an ophthalmologist and was, by and large, capable of opining on general physical exertional restrictions such as lifting and bending. Accordingly, I find this factor weighs slightly in favor of affording Dr. Folk's exertional restrictions more weight than the ALJ afforded it.

### c.  *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given [her] opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Circuit 2006). In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir.

2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quotation omitted).

Dr. Folk's opinion is written on a form called VISION IMPAIRMENT MEDICAL SOURCE STATEMENT. (AR at 834.) While Dr. Folk's opinion was provided on a form that was largely of the check-box, short fill-in-the-blank variety, I find that the opinion does not suffer from the deficiencies that most form opinions do. As will be discussed below, Dr. Folk provided additional support for his opinion that elevates a typical check-box form to a more useful medical opinion.

The section regarding exertional restrictions specifically asked Dr. Folk to "explain the relationship of" his lifting, carrying, stooping, and crouching restrictions "to [Claimant's] vision." (*Id.* at 835.) As discussed, Dr. Folk opined that Claimant could lift and carry 20 pounds in a competitive work situation and could occasionally stoop, bend, and crouch/squat. (*Id.*) The medical basis for Claimant's exertional restrictions was "Can't see well." (*Id.*)

In other places in the opinion form, Dr. Folk stated that the best visual acuity correction achieved in Claimant's right eye was 20/60 and in Claimant's left eye was 20/100. (*Id.* at 834.) Dr. Folk attached 12 pages of treatment notes to his checkbox opinion. (*Id.* at 837-48.) These treatment notes are from appointments on January 27, 2017 and March 10, 2017. (*Id.*) The March 10, 2017 treatment note documents

"[a]ssociated difficulties include daily activities. . . . Characterized as blurry vision." (*Id.* at 837.) The treatment note does not mention problems with eye pressure related to exertion. (*Id.*) In fact, Dr. Folk's treatment notes nowhere mention eye pressure problems when Claimant lifts, stoops, or bends. (*Id.* at 606-728.) Each of Dr. Folk's treatment notes begin with a "History of Present Illness" section wherein he documents Claimant's then-current symptoms and eye problems. (*See e.g. id.* at 606.) Dr. Folk never documented the need for exertional restrictions in Claimant's daily life because of eye pressure. (*Id.* at 606-728.) Accordingly, Dr. Folk's opinion is simply not supported by anything in his own treatment notes and is not entitled to more weight. *Thomas*, 881 F.3d at 675 (holding that treating physician's opinions that provide "little to no elaboration . . . possess little evidentiary value").

Claimant argues that Dr. Folk's opinion on Claimant's exertional restrictions is entitled to more than no weight under 20 C.F.R. Section 404.1527(c)(2)(ii) because Dr. Folks had "reasonable knowledge" of Claimant's exertional restrictions. I have already determined because Dr. Folk is a medical doctor with a specialty in ophthalmology, he was generally competent to opine regarding exertional restrictions. However, the Government challenges Claimant's reliance on Section 404.1527(c)(2)(ii) because whether Dr. Folk was qualified to render his opinion means nothing if there is no indication in the record that he had "reasonable knowledge" of Claimant's overall physical functioning, including her lifting, bending, and stooping restrictions. (Doc. 15 at 5) (citing 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3)) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.")). I agree. While an ophthalmologist might be qualified to assign exertional restrictions, in general,[8]

---

[8] I find that I do not need to decide whether all ophthalmologists are qualified to address the issues before the Court. Because I need only decide whether Dr. Folk was generally competent

that does not mean he can assign such restrictions without having a medical basis for doing so. There is no indication in any of Dr. Folk's treatment notes that he ever asked Claimant about the connection between eye pressure and physical exertion or that Claimant ever reported to him any problems she was having with eye pressure restricting her lifting, carrying, bending, or stooping activities. More importantly, Dr. Folk did provide a medical basis for his exertional restrictions: blurred vision. Blurred vision is supported by the medical records Dr. Folk attached to his opinion. Dr. Folk's other treatment notes track and discuss Claimant's vision issues. (*Id.* at 606-728.) Thus, I find Dr. Folk's only basis for assigning exertional restrictions was Claimant's blurred vision. More relevant, Dr. Folk's treatment notes provide no support for his exertional restrictions. Therefore, I find this factor weighs in favor of giving the opinion no weight.

### d. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). Dr. Folk wrote his opinion on May 28, 2015. Both parties proffer arguments related to this factor. I will address each argument, in turn.

Claimant argues that she testified at the hearing and told the SSA that bending and lifting put pressure on her eyes. (Doc. 13 at 5.) Claimant also asserts that she reported to her primary care physician that she had limited activities like gardening "due to increased pressure when bending forward." (*Id.* at 6) (citing *Id.* at 527). On January 20, 2015, Claimant told the SSA that she "cannot bend for any substantial period of time [] or lift more than 10 pounds at a time" because "these actions put additional pressure on [her] eyes," which "exacerbates" her condition. (AR at 332.) At the hearing on this matter, Claimant testified that "bending and lifting puts pressure on the edema behind the

---

to assign exertional restrictions by virtue of his training, I only find that the "specialization" factor weighs slightly in favor of giving Dr. Folk's opinion more than no weight.

eyes. . . . I cannot do repetitive bending or lifting because it puts pressure on the eyes."
(*Id.* at 191.) She does do yard work, but it takes her longer than it used to because she cannot bend very often due to eye pressure. (*Id.* at 193.) On June 4, 2013, Claimant told her primary care physician that she was unable to do activities like gardening because of increased pressure in her eyes from bending forward. (*Id.* at 527.) Claimant also testified that she gets injections to prevent this pressure. (*Id.* at 193-94.) The injections work and can last approximately five months. (*Id.* at 194, 580, 650, 697.) Her latest injection was supposed to last two-to-two-and-one-half years.[9] (*Id.*) Claimant has no side effects from her injections. (*Id.* at 193.)

The ALJ did not dispute that Claimant has pressure in her eyes. The ALJ found that glaucoma was one of Claimant's severe impairments.[10] The issue is whether the pressure is so severe that Claimant is incapable of working. Although Claimant stated that bending and lifting caused increased pressure in her eyes, she directs the Court to no medical records wherein physicians assigned exertional restrictions based on glaucoma or other eye impairments. Significantly, Claimant testified that medication relieved her symptoms. "If an impairment can be controlled by treatment or medication, it cannot be

---

[9] Claimant argues that although she testified that her then-most recent eye injections were supposed to last two-to-two-and-one-half years, she actually experienced very high right eye pressure seven months after the hearing; thus, the injections did not result in the long-lasting improvement she had hoped for. (Doc. 13 at 7.) Claimant cites high eye pressure readings from dates after the hearing for support. (*Id.*) This post-hearing evidence is irrelevant for two reasons noted by the Appeals Council: (1) because it did not "show a reasonable probability that it would change the outcome of the decision" and (2) because it does not relate to the relevant time period in this case. (AR at 2.) I have not considered this specific post-hearing evidence in making my recommendation, although I do acknowledge that relief from Claimant's injections is not lasting as long as she had hoped.

[10] Glaucoma is "a group of eye diseases usually characterized by an increase in intraocular pressure that causes pathologic changes in the optic disk and typical defects in the field of vision." *Dorland's*, *supra* note 4, at 782. Claimant also testified that her eye pressure is a "kind of a glaucoma type feature." (AR at 194.)

considered disabling." *See Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993). As discussed in footnote 9, Claimant apparently is not experiencing the long relief she was hoping for at the time of her hearing. However, whether she has injections every two years or more often is irrelevant because Claimant still experiences relief from her symptoms. Accordingly, Claimant's testimony and her medical records do not support Dr. Folk's exertional restrictions because Claimant's eye pressure issues are controlled with treatment.

Moreover, I find that the ALJ was not inappropriately assuming the role of doctor when he referred to the longer-term relief Claimant hoped to get from her injections in the following sentence:

> . . . [T]he claimant still manages to function in many areas including performing personal hygiene, light housework, preparing meals, yard work (which should be quite a bit better since the edema is greatly relieved), prepare meals, attend church, go out to eat, shop, attend Bible study, drive, and do other related chores and functions.

(AR at 141.) This sentence immediately followed discussion of the efficacy of eye injections and other medications Claimant uses to treat her edema, including the statement that Claimant "recently received longer lasting edema injections which is a slow releasing medication and it has been effective so far." (*Id.*) In context, the ALJ's statement was merely a statement of fact as it existed at the time—Claimant's "long-lasting" injections were working as they were supposed to work. Claimant had testified as to how long yard work took because of eye pressure problems. It was reasonable for the ALJ to refer to hearing testimony when discussing daily activities and the efficacy of medications.[11]

---

[11] The case at bar can be distinguished from the cases cited by Claimant. In *Pate-Fires v. Astrue*, the claimant had a long history of severe mental health issues. 564 F.3d 935, 937-41 (8th Cir. 2009). The Eighth Circuit reversed a district court's denial of benefits and reasoned that not only did the evidence "overwhelmingly" demonstrate that the claimant's noncompliance was due to mental health issues, but also that the ALJ's determination that the claimant's noncompliance was "attributable to free will [was] tantamount to the ALJ 'playing doctor,' a practice forbidden

According to Claimant, the ALJ's "faulty assumption" that eye injections need only be performed every two years or so resulted in the ALJ's failing to evaluate Claimant's functioning during most of the relevant period. (Doc. 13 at 7.) Claimant cites no evidence to support her argument that the ALJ failed to conduct a thorough review of all evidence germane to the relevant time period. I find that the ALJ did, indeed, conduct a proper review of the relevant evidence in the record. During his evaluation, the ALJ cited medical evidence, Claimant's self-reports to the SSA, and Claimant's testimony. (*Id.* at 138-42.) The ALJ cited extensively to the record to support his conclusions. (*Id.*) The ALJ was not required to discuss every piece of evidence in the administrative record. *Wildman*, 596 F.3d at 966 (quoting *Black v. Apfel*, 143 F.3d

by law." *Id.* at 946-47 (quoting *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996)). In the case at bar, the ALJ did not speculate as to Claimant's motivations for doing certain things. As discussed above, the ALJ acknowledged Claimant's eye pressure issues when he stated what severe impairments Claimant had and when he assigned the RFC. The ALJ was merely acknowledging Claimant's testimony that at the time of the hearing she was optimistic that her injections would last longer than they had previously lasted and that she could engage in one of her daily activities for longer periods of time.

In *Combs v. Berryhill*, the claimant challenged the ALJ's RFC determination. 878 F.3d 642, 645 (8th Cir. 2017). In crafting his RFC, the ALJ had to decide which of two conflicting medical opinions from non-examining reviewing physicians to adopt. *Id.* at 646. The ALJ gave more weight to one of the opinions because the opinion was "more consistent with [the claimant's] record as a whole," in large part because of the claimant's treating physician's notations in treatment notes. *Id.* at 645-46. *Combs* held that the ALJ erred in relying on his own conclusion as to the relevance of certain terms in physician treatment notes when determining the relative weight to assign the competing opinions. *Id.* at 647. The court reasoned that while the claimant's physicians consistently noted that the claimant had a full range of motion, they also consistently diagnosed her with rheumatoid arthritis and prescribed medications for pain. *Id.* Therefore, the court found that the ALJ had relied on his own interpretations of terms in treatment notes when crafting the claimant's RFC, which violated the ALJ's duty to fully and fairly develop the record. *Id.* (citation omitted). The court remanded the case so the ALJ could conduct further inquiry as to what relevance the treatment note terms had for the claimant's ability to function in the workplace. *Id.* In the case at bar, the ALJ was not interpreting treatment note terms. Rather, he was restating Claimant's testimony. Just prior to the sentence at issue, the ALJ noted that Claimant said the new supposedly-long-lasting injections were providing relief. (AR at 141.) Accordingly, I find this argument to be without merit.

383, 386 (8th Cir. 1998)); *Holmes v. Astrue*, No. C10-2042, 2011 WL 2580333, at \*11 (N.D. Iowa June 28, 2011) (same).

Claimant also argues that the objective medical evidence is consistent with her complaints. For support, Claimant cites tonometry readings, which often showed high eye pressure in one or both eyes.[12] (*See* AR at 589, 604, 609, 614, 628, 670, 704, 846.) For the same reasons that Claimant's self-reports that bending, stooping, lifting, and carrying increase her eye pressure do not support Dr. Folk's exertional restrictions, these high tonometry readings also do not support Dr. Folk's exertional restrictions. The issue is not the existence of pressure. The question is the impact on exertion. Moreover, Claimant's eye pressure issues are relieved with medication and are therefore not disabling. *Stout*, 988 F.2d at 855.

Claimant further asserts that Dr. Folk's opinion is in concert with the opinion of consulting ophthalmologist John Alpar. Claimant avers that the ALJ erred in not acknowledging this and using this supposed disagreement as a reason to assign less weight to Dr. Folk's exertional restrictions opinion. Claimant contends this is "particularly egregious" because Dr. Alpar assigned a ten-pound lifting and carrying limitation only after explaining that he was providing limitations based on Claimant's eye conditions. (*Id.*)

Dr. Alpar is the only other ophthalmologist who provided an opinion in this case.[13] Claimant argues that because Dr. Alpar stated that his opinions would be "based exclusively on [Claimant's] eye condition (*Id.* at 880), the ALJ should have given Dr. Folk's opinion more weight. Dr. Alpar concluded that Claimant's impairments do not meet or equal a listing and provided reasons for his conclusions. (*Id.* at 878, 880.)

---

[12] Tonometry is "the measurement of tension or pressure, particularly intraocular pressure." *Dorland's*, *supra* note 4, at 1937.

[13] Because Dr. Alpar is an ophthalmologist, I find that he, too, was generally qualified to give opinions regarding patients' physical health.

Because Dr. Alpar concluded that Claimant did not have a listed impairment, he was asked to provide functional restrictions for Claimant. (*Id.* at 879.) This is where Dr. Alpar stated that his opinions are based on Claimant's eye condition. (*Id.* at 880.) Accordingly, I find that unlike Dr. Folk, Dr. Alpar did tie his ten-pound lifting and carrying restrictions to Claimant's eye problems. However, that finding does not end the inquiry. Dr. Alpar's opinion was provided on a form supplied to him by the SSA. When Dr. Alpar received his request for a medical opinion, the cover letter stated that the SSA was providing a CD "with exhibits selected for inclusion in the record of this case and . . . a list of this evidence." (*Id.* at 863.) The record does not show what evidence was selected for Dr. Alpar's review. Even if the entire administrative record was included, Dr. Alpar's opinion is still problematic.

While Dr. Alpar based his exertional restrictions on Claimant's eye conditions, he did not document what parts of the record support his conclusions. If his restrictions are based on objective clinical findings or advice an ophthalmologist gave Claimant, that could be persuasive evidence. However, if his restrictions are based solely on Claimant's self-reports, Dr. Alpar's restrictions are less persuasive. Dr. Alpar discussed the record as it related to functional restrictions, stating that he wanted to call attention to Claimant's need for large print and large fonts and noting that Claimant could likely still drive, albeit with a restricted license, but said nothing about Claimant's exertional restrictions.[14] (*Id.* at 880.) Accordingly, I find that Dr. Alpar's exertional restrictions "consist of nothing more than . . . checked boxes. . . . They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value." *Thomas*, 881 F.3d at 675. It appears Dr. Alpar's opinion is based on Claimant's eye problems, which is what one

---

[14] Claimant testified that she still holds an unrestricted driver's license, but has limited herself to driving very rarely, and then only on bright sunny days. (AR at 178-79.) Driving under other conditions is "beyond scary" for Claimant. (*Id.* at 179.)

would expect from an opinion from an ophthalmologist.[15]  Accordingly, I find that Dr. Alpar's opinion regarding exertional restrictions is unsupported.  Therefore, even if the ALJ had found the opinion in concert with Dr. Folk's opinion, it would not have changed the ALJ's decision on this issue.

In addition, I find that the other medical opinions do not support giving Dr. Folk's exertional restrictions opinion more weight.  In relevant part, Dr. John Anigbogu opined Claimant could lift and carry up to ten pounds occasionally.  (*Id.* at 886.)  In addition, Dr. Anigbogu found no reaching, handling, fingering, feeling or pushing and pulling restrictions.  (*Id.* at 888.)  Dr. Anigbogu noted various environmental and postural restrictions, but did not specifically opine as to Claimant's bending restrictions. (*Id.* at 888-90.)  The ALJ found that Dr. Anigbogu's opinions related to Claimant's physical restrictions were not supported because Dr. Anigbogu did not specify which of Claimant's seven impairments caused his recommended restrictions.  (*Id.*)  In addition, the ALJ found that Dr. Anigbogu's opinion was inconsistent with Claimant's testimony that she is left-handed; Dr. Anigbogu stated she was right-handed.  (*Id.*)  Dr. Anigbogu's opinion was provided on the same SSA form as Dr. Alpar's opinion and Dr. Anigbogu provided no supplemental explanation for any of his check-box responses.  (*Id.* at 881-91.)  Therefore, Dr. Anigbogu's opinion is not entitled to any more than the limited weight the ALJ assigned it.  *See Thomas*, 881 F.3d at 675.  Moreover, Dr. Anigbogu's opinion is at odds with Dr. Folk's exertional restrictions opinion and therefore does not support Dr. Folk's opinion.

In relevant part, the state agency physicians opined that Claimant had no exertional restrictions.  (*Id.* at 211.)  The ALJ gave the physicians' opinions little weight because the physicians did not consider the effect Claimant's documented obesity had on her

---

[15] For the reasons that Dr. Folk's opinion is not supported by substantial evidence in the record, I also find that Dr. Alpar's opinion is not supported by substantial evidence in the record.

exertional abilities. (AR at 142.) The ALJ went on to note that he was limiting Claimant's RFC to the medium level based on "the claimant's arthritis and testimony about lifting putting pressure on her eyes." (*Id.*) I find that these opinions do not support Dr. Folk's exertional restrictions.

Therefore, none of the medical opinion evidence supports Dr. Folk's exertional restrictions opinion because they are either at odds with Dr. Folk's exertional restrictions or because they suffer from defects that render them unreliable.

The Government argues that Claimant's ability to engage in a wide variety of daily activities supports finding that Dr. Folk's exertional restrictions are not supported in the record. Claimant told the SSA that on a typical day, she accomplishes the following tasks before lunch: takes care of her own personal hygiene, including showering; "fix[es] the bed"; brings dirty laundry to the laundry room; has breakfast and washes the breakfast dishes; cleans the kitchen; sweeps and mops the floor; watches television; and makes lunch. (*Id.* at 394.) After lunch, Claimant does laundry; does some "light cleaning," such as vacuuming or dusting; listens to music; watches television; makes dinner; washes dishes; cleans and sweeps the kitchen; watches more television; and goes to bed. (*Id.*) In her most recent Adult Function Report, Claimant stated that lunches are usually sandwiches or leftovers and dinners are usually "full balance[d] meals." (*Id.* at 399.) Claimant is also able to rake leaves, although it takes time. (*Id.*) Claimant shops weekly for groceries and less often for household goods, both in stores and by phone. (*Id.* at 400.) Claimant's hobbies include visiting with people daily, both in person and on the phone; going to church; and going out to eat. (*Id.* at 401.) She has given up her old hobbies of reading, using the computer, crocheting, and crafting due to her impairments. (*Id.*) She told a physician that she gave up gardening because of eye pressure. (*Id.* at 527.)

I agree that in isolation this list does not support a finding of disability. However, this list is not inconsistent with Dr. Folk's exertional restrictions because none of Claimant's daily activities necessarily implicates lifting or carrying more than 20 pounds, bending, or stooping. While the list is not at odds with Dr. Folk's exertional restrictions, I find that is does nothing to support them, either. Claimant said she gave up her hobbies due to her impairments, but does not state to which impairments she was referring. Because reading, using the computer, crocheting, and crafting do not involve lifting, carrying, bending, or stooping, the Court should not speculate as to what impairments Claimant was referring. Therefore, I find that evidence of Claimant's daily activities is neutral as it relates to Dr. Folk's opinion on Claimant's exertional restrictions.

> ### f.    Conclusion

After analyzing the foregoing five factors, I find that substantial evidence on the record as a whole supports the ALJ's decision on the narrow issue before the Court. *See Hacker*, 459 F.3d at 936 (holding that the court cannot disturb the ALJ's decision if it is within the available "zone of choice" within which the ALJ can decide).

I further find that although he did so in a cursory manner, the ALJ properly explained his reasons for assigning no weight to Dr. Folk's exertional restrictions opinion. "An arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome." *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). The ALJ analyzed all of the above factors during the course of his analysis and explained why the evidence does not support more limited exertional restrictions than he assigned. (AR at 139-42.) To the extent the ALJ's explanation was insufficient, I find it was harmless error. A harmless error occurs when there is no indication that the ALJ would have reached a different decision without the alleged error. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (citing *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008)) (holding

there was no indication the ALJ would have decided differently had he not committed the error and therefore the error was harmless). As the above analysis demonstrates, a more complete analysis of Dr. Folk's exertional restriction opinion and, presumably, a more thorough explanation of his reasons for the weight the ALJ assigned to the opinion, would not have resulted in a different outcome. The ALJ would still have assigned no weight to Dr. Folk's opinion because of the lack of support for the opinion both in Dr. Folk's treatment notes and in the rest of the administrative record.

Therefore, I recommend that the District Court affirm the ALJ's decision on this issue.

## B.   *Claimant failed to timely raise her Appointments Clause argument under Lucia v. SEC.*

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that Social Security Administration ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. Claimant asserts this Court should vacate the denial of benefits by ALJ Meyr and remand the case for decision by what he contends is a properly-appointed ALJ. Claimant admits that she is asserting her Appointments Clause challenge for the first time in her opening brief to this Court.

Claimant does not argue that her case presents any factual or procedural differences from other cases that have previously been addressed by this Court. Indeed, this case has the same procedural posture as several other cases wherein this Court already addressed this issue (i.e., all administrative proceedings, including denial by the Appeals Council, were completed before *Lucia* was decided on June 21, 2018).

This Court has ruled in favor of the Commissioner on similar claims on many occasions. *See White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).

In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id.* In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.

Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

2018 WL 4380984, at **5–6 (paragraph break added); *see also Kimberly B. v. Berryhill*, No. 17-CV-5211 (HB), 2019 WL 652418, at *14 (D. Minn. Feb. 15, 2019) (noting that

the "Eighth Circuit has concluded that a party forfeits an Appointments Clause claim by failing to raise it to the agency") (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013)).

Although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-1003[16] prevented the ALJ from addressing the issue, nothing stopped Claimant from raising the issue during the administrative prosses and preserving it for appeal. In addition, Claimant's argument that Acting Commissioner Berryhill's authority lapsed between November 2017 and April 2018, leaving no one at the SSA with the "power to correct the Appointments Clause issue . . . [when her] claim was pending with the Appeals Council" (Doc. 13 at 13, n.9), is unavailing for the same reason. Nothing prevented Claimant from raising this issue in her appeal to the Appeals Council and preserving it for appeal to this Court. Accordingly, I recommend that Claimant's request for remand on this basis be denied.[17]

## IV.   CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm the decision of the ALJ** and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as

---

[16] EM-1003 was issued on January 30, 2018, and stated, "Because the SSA lacks the authority to finally decide constitutional issues such as these, ALJs will not discuss or make any findings related to the Appointments Clause issue on the record." It did not prevent claimants from making such challenges and, by its very existence, anticipated that claimants would make them.
[17] Claimant's counsel states in footnote 7 of Claimant's brief that evidence in the record "clearly shows" that Claimant suffers from intellectual functioning limitations. I dismissed this argument as an inadvertent "cut and paste error." Claimant does not claim to have intellectual impairments and appears from the record to be a person of at least average intellectual capabilities.

well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 25th day of July, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa